Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
07/10/2024 06:10 PM CDT

Larry J. Stava, appellee, v.
Carine F. Stava, appellant.
___ N.W.3d ___

Filed April 30, 2024.    No. A-23-249.

1. **Divorce: Child Custody: Property Division: Alimony: Attorney Fees: Appeal and Error.** In a marital dissolution action, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge in his or her determinations regarding custody, child support, division of property, alimony, and attorney fees.

2. **Judges: Words and Phrases.** A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition.

3. **Divorce: Property Division.** In a marital dissolution action, the equitable division of property is a three-step process. The first step is to classify the parties' property as either marital or nonmarital, setting aside the nonmarital property or nonmarital portion of the property to the party who brought the property to the marriage. The second step is to value the marital assets and marital liabilities of the parties. And the third step is to calculate and divide the net marital estate equitably between the parties.

4. ____: ____. Any given property can constitute a mixture of marital and nonmarital interests; a portion of an asset can be marital property while another portion can be separate property.

5. ____: ____. The original value of an asset may be nonmarital, while all or some portion of the appreciation of that asset may be marital.

6. ____: ____. The appreciation or income of a nonmarital asset during the marriage is marital insofar as it was caused by the efforts of either spouse or both spouses.

7. **Divorce: Property Division: Presumptions.** Accrued investment earnings or appreciation of nonmarital assets during the marriage are

presumed marital unless the party seeking the classification of the growth as nonmarital proves: (1) The growth is readily identifiable and traceable to the nonmarital portion of the account and (2) the growth is not due to the active efforts of either spouse.

8. **Divorce: Property Division: Real Estate.** Whether appreciation in real estate is active or passive depends on the facts and circumstances of each case.

9. **Divorce: Property Division: Proof.** The burden is on the owning spouse to prove the extent to which marital contributions did not cause the appreciation or income.

10. **Divorce: Property Division: Equity.** The equity in property at the time of marriage is a nonmarital asset which, if established, should be set aside as separate property.

Appeal from the District Court for Washington County: John E. Samson, Judge. Affirmed as modified.

David Pontier, of Koenig | Dunne, P.C., L.L.O., for appellant.

Donald A. Roberts, of Roberts Law, L.L.C., for appellee.

Moore, Bishop, and Arterburn, Judges.

Bishop, Judge.

## I. INTRODUCTION

Carine F. Stava appeals the Washington County District Court's decree dissolving her marriage to Larry J. Stava. Carine assigns error to the district court's classification of two properties—the "marital residence acreage" and the "barn acreage"—as Larry's separate, premarital property and to its application of an active appreciation analysis to the properties. The land on which the marital residence and the barn were built was acquired and paid for by Larry before the marriage; the evidence supported the fact that the land underlying the structures was nonmarital, including its passive appreciation. The marital residence was built before the marriage but was encumbered by a mortgage when the parties married. The parties thereafter jointly contributed to paying down the mortgage, with a large final lump-sum payment made with Larry's nonmarital funds. The court gave Carine credit for

the reduction in the mortgage on the marital residence, but otherwise found all appreciation on the residence during the marriage to be nonmarital. Although we might have concluded differently regarding a portion of the appreciation on the home, we cannot say the district court abused its discretion as to these determinations.

We do, however, find merit to Carine's argument with respect to the barn built on the barn acreage, which should have been classified as marital property, with a setoff to Larry for his inherited nonmarital funds applied to the parties' jointly held loan. We therefore affirm as modified, resulting in an increase from $45,000 to $90,334 in the marital equalization judgment owed by Larry to Carine.

## II. BACKGROUND

Larry and Carine were married on May 25, 2002. They had no children together. Larry filed a complaint to dissolve the marriage in December 2020; he requested an equitable division of the parties' property and debts. Carine filed an answer and counterclaim seeking the same.

Trial was held on January 4 and 5, 2023. Both parties testified, and numerous exhibits were received into evidence. The evidence will be set forth as necessary in our analysis below.

Pursuant to the district court's decree entered on February 27, 2023, the parties' marriage was dissolved and their property and debts were divided; Larry was to pay Carine a property equalization judgment of $45,000. As relevant to this appeal, the court found that both the residential acreage (Tax Lot 14) and the barn acreage (Tax Lot 15) were owned by Larry prior to the marriage and that Carine's name was never added to any deed to those parcels. The court noted, however, that during the parties' marriage, they paid down the principal balance of real estate loans: "The total mortgage paydown during the marriage was $84,620.00 on Tax Lot 14 and $25,631.00 on Tax Lot 15 for a total of $110,251.00." The court also found that both Tax Lot 14 and Tax Lot 15 increased

in value during the marriage, but that Larry met his burden to prove that the increase in value was due to market forces and not to the active efforts of either party. "Accordingly, the only amount that can be attributed to the marital estate with respect to [Larry's] home and the barn (Tax Lot 14 and Tax Lot 15), is the paydown on the mortgages set forth above in the sum of $110,251.00."

Carine appeals.

## III. ASSIGNMENTS OF ERROR

Carine assigns that the district court erred (1) by classifying Tax Lot 14 and Tax Lot 15 as Larry's separate, premarital property and (2) by applying an active appreciation analysis to marital property and erroneously identifying and tracing all appreciation on Tax Lot 14 and Tax Lot 15 to Larry's nonmarital interests in the properties, thereby inequitably dividing the parties' marital estate. Alternatively, Carine assigns that the district court erred (3) in finding that Larry met his burden to show that all appreciation on Tax Lot 14 and Tax Lot 15 was caused by passive appreciation.

## IV. STANDARD OF REVIEW

[1,2] In a marital dissolution action, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge in his or her determinations regarding custody, child support, division of property, alimony, and attorney fees. *Parde v. Parde*, 313 Neb. 779, 986 N.W.2d 504 (2023). A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Id.*

## V. ANALYSIS

### 1. GENERAL PRINCIPLES OF LAW

[3] In a marital dissolution action, the equitable division of property is a three-step process. The first step is to

classify the parties' property as either marital or nonmarital, setting aside the nonmarital property or nonmarital portion of the property to the party who brought the property to the marriage. The second step is to value the marital assets and marital liabilities of the parties. And the third step is to calculate and divide the net marital estate equitably between the parties. *Id.*

[4-6] Any given property can constitute a mixture of marital and nonmarital interests; a portion of an asset can be marital property while another portion can be separate property. *Id.* The original value of an asset may be nonmarital, while all or some portion of the appreciation of that asset may be marital. *Id.* The appreciation or income of a nonmarital asset during the marriage is marital insofar as it was caused by the efforts of either spouse or both spouses. *Id.*

[7] The active appreciation rule sets forth the relevant test to determine to what extent marital efforts caused any part of an asset's appreciation or income. *Id.* Accrued investment earnings or appreciation of nonmarital assets during the marriage are presumed marital unless the party seeking the classification of the growth as nonmarital proves: (1) The growth is readily identifiable and traceable to the nonmarital portion of the account and (2) the growth is not due to the active efforts of either spouse. *Id.* Appreciation caused by marital contributions is known as active appreciation, and it constitutes marital property. *Id.* Passive appreciation is appreciation caused by separate contributions and nonmarital forces. *Id.*

[8] Some assets are more subject to active appreciation, while others are more subject to passive appreciation. *Id.* By its nature, real estate is more prone to passive appreciation. *Id.* This is because real estate tends to rise and fall in value for reasons beyond the parties' control. *Id.* Ultimately, whether appreciation in real estate is active or passive depends on the facts and circumstances of each case. *Id.* In that regard, evidence relating to the *cause* of appreciation is key. *Id.*

[9] The burden is on the owning spouse to prove the extent to which marital contributions did not cause the appreciation or income. *Id.*

With these principles in mind, we discuss Tax Lot 14 and Tax Lot 15, the properties at issue in this appeal.

## 2. TAX LOT 14

### (a) Evidence at Trial

In January 1997, Larry purchased 32 acres of real property from his parents described as Tax Lot 14 in Section 34, Township 17 North, Range 11 East of the 6th P.M., in Washington County, Nebraska. Larry testified that he paid for Tax Lot 14 in full prior to the parties' May 2002 marriage.

Larry also built a house and shed on Tax Lot 14 prior to the parties' marriage; both the primary and secondary buildings went on the tax rolls in 1999. To build the home, Larry took out a $195,000 loan, at 7.95 percent interest, from Pinnacle Bank in September 1999. Larry paid on that loan until the parties were married, after which the parties jointly refinanced the loan in September 2003 with one bank and transferred the loan in 2009 to another bank.

In 2014, Larry sold another property he owned prior to the parties' marriage—"Lot 4 at Bennington Industrial Park"—for $182,500. Larry used $107,126.88 of those nonmarital funds to pay off the home loan on November 13.

Larry calculated the amount of the principal that was paid down on the home loans during the parties' marriage. According to his calculations, there was a total principal reduction of $84,620 during the marriage; he believed that Carine should get credit for one-half of that amount.

Carine believed that she should get a portion of the marital equity in Tax Lot 14. However, if the district court determined that she was not entitled to a portion of the marital equity, then the parties stipulated that she should get $42,310 in credit for her one-half of the mortgage reduction. Larry requested

that Tax Lot 14 be awarded to him, giving Carine credit for one-half of the mortgage reduction.

When asked if, after building the home, he made any substantial improvements to it (e.g., adding rooms or building on), Larry replied, "No." He agreed that routine maintenance and upkeep occurred during the marriage. That work included painting the inside of the home several times, including a custom mural; drywall repair work; adding a ceiling to make a room in the unfinished part of the basement; adding carpet to the basement (there was none before); replacing carpet with "composite hard floor" on the main floor of the home; and repairing water damage in a bathroom. Carine testified that the parties also added a bedroom in the basement. Taxes were paid during the marriage with marital funds.

Russell Nelsen, a certified real estate appraiser, was hired by Larry to appraise the property. Nelsen did a "retro" appraisal to determine the 2002 value of the land and the structures, and he also determined the 2022 value of the land and the structures. His reports were received into evidence.

Nelsen testified that "after the inspection" for residential appraisals, comparable sales are used as the "main source of valuation" and "replacement cost less depreciation" is the other method. Nelsen stated that an "income approach" is not typically accurate for valuing a single-family residential property. When doing an appraisal for a previous time period, the main difference is that there is no inspection, "[b]ut otherwise, it's all comparable sales from that period and then preceding that period up to maybe six months to a year."

Nelsen determined that the value of Tax Lot 14 (land, house, and outbuilding) was $385,000 in May 2002 and $860,000 in November 2022—an increase of $475,000. More specifically, he determined that the site (land) value was $121,600 in May 2002 and $512,000 in November 2022, an increase of $390,400 attributable to just the land. In his supplemental addendum, Nelsen wrote:

The value estimates . . . have increased substantially over the past 20 years. In the case of TAX LOT 14 that has the house and outbuilding, the value increase is mostly due to market forces that have influenced land values as well as single family rural residential values in this area. Per owner, very few improvements to the home have been made over this time frame. These include some updated flooring and basement finish which has minimal influence on value.

. . . .

Land value for the subject's tracts have increased over 400%.

Nelsen was asked for his opinion as to why the value for Tax Lot 14 had increased since 2002. Nelsen stated, "The market has substantially increased in the last few years, and it's all due to what's happened in the market, as far as values have increased substantially with regards to both improvements and the land for homes." When asked if it was his opinion that the increase in value was not due to improvements but due to market forces, Nelsen replied, "Yeah, it was mostly market forces due to the increase in . . . values of acreage property . . . ." Nelsen answered affirmatively when asked if a reason for the increase was that a lot of people were looking for acreage property. He was also asked if a reason for the increase was lending practices. Nelsen responded, "Yep, pretty much. Values are always a function of financing, and banks, they tend to be more eagerly willing to finance on homes on acreages rather than outbuildings."

On cross-examination, Nelsen testified that "[t]here were some dated features in the home, but it had been maintained fairly well," with "pretty much average maintenance." On redirect examination, Nelsen stated that "[t]ypical maintenance does not" increase property value. According to Nelsen, the flooring work and basement finish were minimal maintenance. He said, "[A]ny basement finish value is a function of financing" and "[b]anks do not give a lot of credit to basement

finish," "[e]specially if it's average or less"; "there's nothing extra fancy about the basement finish in that home." On recross-examination, Nelsen stated that other than "flooring and a little bit of basement finish," he was not aware of any other efforts by the parties to maintain or improve the home. And when asked again about his opinion as to the specific reason for the increase in the value of Tax Lot 14, Nelsen said, "It's mostly due to market forces, . . . site and per square foot value on the house, how they've increased."

### (b) District Court's Ruling

The district court found that Tax Lot 14 was owned by Larry prior to the marriage and that Carine's name was never added to any deed to that parcel. The court noted, however, that "[t]he total mortgage paydown during the marriage was $84,620.00 on Tax Lot 14 . . . ." The court found that the residential acreage increased in value during the marriage, but that according to Nelsen, whose testimony the court found to be credible, the increase in value was due to market forces. Additionally, the court accepted Nelsen's testimony that normal maintenance of the house did not increase the value of the property. The court found that Larry met his burden to prove that the increase in value of the property was due to market forces and not to the active efforts of either party. "Accordingly, the only amount that can be attributed to the marital estate with respect to [Larry's home, Tax Lot 14], is the paydown on the mortgage[]."

### (c) Did District Court Abuse
### Its Discretion?

#### (i) Premarital Land

Larry owned the 32-acre parcel of land outright prior to the parties' marriage; it was therefore Larry's nonmarital asset. However, the land value appreciated $390,400 during the marriage. The appreciation of nonmarital assets during the marriage is presumed marital, and the burden was on Larry

to prove otherwise. See *Parde v. Parde*, 313 Neb. 779, 986 N.W.2d 504 (2023). To do so, Larry had to prove (1) the growth was readily identifiable and traceable to the nonmarital portion of the asset and (2) the growth was not due to the active efforts of either party. See *id.* We agree with the district court that Larry met his burden to prove the land and its appreciation was nonmarital. Nelsen's appraisal showed that the land itself (Larry's nonmarital asset) increased in value by $390,400 during the parties' marriage. Further, Nelsen testified that the increase in land value was due to market forces. There was no evidence to the contrary. Accordingly, the land's appreciated value is solely Larry's nonmarital asset, and the district court did not abuse its discretion in this regard.

### (ii) House

[10] Larry also owned the house and outbuilding prior to the parties' marriage, but it was encumbered by a mortgage. According to Nelsen's appraisal, the home and outbuilding had a value of $263,400 at the time of the parties' marriage in May 2002 ($385,000 total value of Tax Lot 14 minus $121,600 land value). Larry had a mortgage loan balance of $190,306 in May 2002. Thus, Larry's equity in the home at the time of the marriage was $73,094 ($263,400 value minus $190,306 loan balance). The equity in property at the time of marriage is a nonmarital asset which, if established, should be set aside as separate property. *Parde v. Parde, supra*.

During the parties' marriage, the mortgage was paid down with $84,620 of marital funds, and then was paid off with $107,126.88 of Larry's nonmarital funds (proceeds from the sale of another nonmarital property). The district court assigned the $84,620 marital paydown of the mortgage loan as a marital asset awarded to Larry; this effectively gave Carine credit for one-half of that mortgage reduction. We find no abuse of discretion in that regard.

The remaining issue is the district court's treatment of the appreciation in the house and outbuilding. According to

Nelsen's appraisal, the value of the home and outbuilding was $348,000 in November 2022 ($860,000 total value of Tax Lot 14 minus $512,000 land value). Subtracting out the $84,620 marital paydown already accounted for by the district court, the remaining value of the home and outbuilding is $263,380. However, Larry is entitled to have his $73,094 premarital equity and $107,126.88 mortgage payoff from nonmarital funds set aside as nonmarital assets. Thus, the house and outbuilding had $83,159.12 in remaining equity due to appreciation. We summarize our calculations below:

| | |
|---|---|
| Total Value of Tax Lot 14 in 2022 | $860,000.00 |
| Land Value | (512,000.00) |
| Home and Outbuilding Value | $348,000.00 |
| Marital Mortgage Paydown | (84,620.00) |
| Remaining Home and Outbuilding Value | $263,380.00 |
| Larry's Premarital Equity | (73,094.00) |
| Larry's Nonmarital Payoff | (107,126.88) |
| Remaining Equity in Home and Outbuilding | $ 83,159.12 |

As stated previously, the appreciation of nonmarital assets during the marriage is presumed marital, and the burden was on Larry to prove otherwise. *Parde v. Parde, supra*. To do so, Larry had to prove (1) the growth was readily identifiable and traceable to the nonmarital portion of the asset and (2) the growth was not due to the active efforts of either party. See *id.*

Nelsen testified that the increase in the value from 2002 to 2022 was "mostly" due to market forces. People were looking for acreage property, "[v]alues are always a function of financing," and "banks . . . tend to be more eagerly willing to finance on homes on acreages rather than outbuildings." Nelsen noted that the home had some dated features but had been maintained fairly well, with "pretty much average maintenance." However, "[t]ypical maintenance does not" increase property value. He also stated that there was basement finish,

but "[b]anks do not give a lot of credit to basement finish," "[e]specially if it's average or less"; "there's nothing extra fancy about the basement finish in that home."

Carine testified that during the marriage she "did probably 90 percent of the cleaning in the house" and Larry "did the maintenance." The parties also had someone paint the main level of the home, and Carine hired someone to paint a "custom room." While Larry was gone hunting, Carine "had the basement painted and carpeted" and "also had [a bedroom] built" in the basement. Carine also traded some "horse work" (lessons and care) and took on some freelance riding instructor work at other barns to fund the replacement of flooring in the home. Although Carine testified that the foregoing improvements were made, she did not produce evidence to support that these improvements increased the home's value.

The district court found Nelsen's testimony to be credible and accepted his testimony that normal maintenance did not increase the property value. The court also found that Larry met his burden to show that no improvements were made during the marriage that increased the value of the home and that the increase in value was due to market forces "(e[.]g. . . . increase in construction costs)" and not to the active efforts of either party.

We observe that although Nelsen's testimony supported that the appreciation was "mostly" due to market forces, he never claimed it was entirely related to market forces. Therefore, while most of the remaining presumed marital appreciation of $ 83,159.12 was sufficiently proved as nonmarital by Nelsen's testimony, the "mostly" language left open the possibility that some portion of it could have remained characterized as marital property. Besides the evidence regarding the various improvements made to the home and the joint payments made on the house mortgage by the parties for at least a decade before the house loan was paid off, we note that the parties also jointly paid insurance and property taxes for Tax Lot 14 during their marriage, thus depleting the marital estate (while

benefiting the nonmarital property) without any corresponding equitable credit. Therefore, in our view, some portion of the $83,159.12 in appreciation could have remained characterized as marital. However, given our standard of review, we cannot say the district court abused its discretion in finding otherwise, since it was reasonable for the court to rely on Nelsen's opinion that the appreciation was due to market forces and not the active efforts of the parties.

### 3. Tax Lot 15

#### (a) Evidence at Trial

In January 1998, Larry purchased approximately 33.7 acres of real property described as Tax Lot 15 in Section 34, Township 17 North, Range 11 East of the 6th P.M., in Washington County, Nebraska. Larry testified that he paid cash for Tax Lot 15; the real estate transfer statement shows a purchase price of $169,000.

Larry stated that prior to the parties' marriage, he and Carine talked about building a barn so that Carine could operate a horse business. In October 2001, Larry and Carine formed "The Farm at Butterflat Creek, L.L.C." According to the operating agreement, it was to be a "[h]orse boarding business and [to] provide instruction and training." Larry and Carine were equal members of the business.

Larry testified that a barn was built on Tax Lot 15 prior to the parties' May 2002 marriage. To construct the barn, Larry and Carine took out a $180,215.75 loan, at 7.5 percent interest, from Pinnacle Bank on October 4, 2001; both parties were listed as borrowers on the loan documents. The scheduled monthly payments were $2,229.36 per month beginning May 1, 2002, with a final balloon payment of $113,182.15 due on April 1, 2007. The deed of trust for the loan was secured by Tax Lot 14 and Tax Lot 15. The Pinnacle Bank barn loan was paid off on January 30, 2004.

Larry testified that his mother wanted to carry the barn loan, so on January 30, 2004, his mother gave him

$180,000—$10,000 was a gift and the other $170,000 was a loan. (Prior to trial, Carine had never heard about a $10,000 gift to Larry.) Exhibits in evidence show that Larry used $156,754.74 of that money to pay off the Pinnacle Bank barn loan on January 30. (That same day he used an additional $22,024.64 to pay the parties' separate Pinnacle Bank loan for a 1999 Dodge Ram and a 1995 trailer.) Also on January 30, Larry and Carine signed a promissory note promising to pay $157,000, at 4.5 percent interest, to Larry's mother, "Marcella M. Stava, Trustee, or her successor Trustee, of the STAVA REVOCABLE LIVING TRUST." The deed of trust for the loan was secured by Tax Lot 15. (Larry and Carine signed a second promissory note on January 30 promising to pay the trustee of the Stava Revocable Living Trust $13,000, at 4.5 percent interest; this loan was secured by the 1999 Dodge Ram.) The parties made monthly loan payments to Larry's mother.

Larry's mother passed away in July 2005, and Larry's brother was the personal representative of her estate. Larry received a letter from his brother dated August 4, 2005, informing him that $100,000 "from the Stava Revocable Living Trust has been distributed to you in the form of a reduction of your promissory note" as of that date. Larry received a second letter from his brother dated November 23, 2005, informing him that $53,270.89 "from the Stava Revocable Living Trust has been distributed to you in the form of a reduction of your promissory note" as of that date. Larry testified that those reductions paid off the two promissory notes and that he paid no further money on those promissory notes.

Larry calculated the amount of the principal that was paid down on the barn loans during the parties' marriage. According to his calculations, there was a total principal pay-down of $25,631 by the parties during the marriage. Carine believed that she should get a portion of the marital equity in the property. However, if the district court determined that

she was not entitled to a portion of the marital equity, then the parties stipulated that she should get $12,815 in credit for her one-half of the barn loan paydown. Larry requested that Tax Lot 15 be awarded to him, giving Carine credit for one-half of the parties' principal paydown on the barn loan.

Larry agreed that the fences and buildings on the property had to be repaired and maintained during the marriage. The land also had to be maintained during the marriage to successfully produce hay that Larry sold. The road was "rocked" at the time of the parties' marriage; however, it needed to be graded periodically and have more gravel added. The sand in the arenas needed to be leveled and "harrow[ed]" to maintain them. Larry "bladed and maintained the dry lots the same way." Taxes on the barn were paid during the marriage. Larry said that he took care of the land while Carine took care of the customers.

Carine testified that her responsibility was teaching, training, and maintaining the horses, while Larry took care of any required maintenance and the finances. Carine said that she also provided maintenance and upkeep on the barn property; that she "fixed the fence multiple times, pulling posts out, adding posts, adding rails"; that she worked on the equipment, painted, put in motion lights, "sprayed for weeds quite a bit" and cut them down (to prevent trees from growing); and that she "just laid gravel down here recently." She also testified that she added "a concrete wash bay and two outdoor loafing sheds or turnout sheds so the horses could have shelter," as well as three metal pens.

Nelsen also appraised this property. He again did a "retro" appraisal to determine the 2002 value, and he also determined the 2022 value of the property. His reports were received into evidence. Nelsen testified that "comparable sales are limited" for both 2002 and 2022, but otherwise, he used the same methodology for Tax Lot 15 that he used for Tax Lot 14.

Nelsen determined that the value of Tax Lot 15 (land and improvements) was $386,700 in May 2002 and $794,000

in November 2022—an increase of $407,300. More specifically, he determined that the site (land) value was $128,500 in May 2002 and $540,000 in November 2022—an increase of $411,500, attributable to just the land. In his supplemental addendum, Nelsen wrote:

> The value estimates . . . have increased substantially over the past 20 years. . . .
>
> With regards to TAX LOT 15 that has the barn/ stable and other open outbuilding, no major additional improvements have been made since 2002. Unimproved land values in the area have increased greatly over the past 2-3 years. The increase in value for this tract is also due to market forces. Most of the increase in value for this tract is due to the increase in the subject's site value. The 2022 value of improvements on this tract are estimated to be similar to the 2002 value as an increase of construction costs are mostly off set by physical depreciation. Some improvement value increase is noted. Value is influenced by financing and lenders in 2002 and 2022 place less value on outbuildings than on a home in a rural setting.
>
> Land value for the subject's tracts have increased over 400%. The value increase for TAX LOT 15 is mostly based on the increase in its' [sic] site value.

Nelsen testified that he "did not detect any major recent improvements on the barn or other exterior improvements." He testified: "Market forces have influenced particularly land values in that area. The improvement value not so much, but certainly the land values have increased substantially." Nelsen was asked if, in his expert opinion, the increase in value of Tax Lot 15 was a result of market forces as opposed to improvements; he replied, "Yes, for sure."

On cross-examination, Nelsen testified that he "gathered . . . there hadn't been really any improvements" on the barn and that "[i]f there were, it was very limited" and was "[p]retty much all maintenance items again." "Typical

maintenance does not" increase property value. With regard to the improvement value noted in his supplemental addendum, "[a]ny improvement value was based on increase in construction costs not any other additional improvements." On redirect examination, Nelsen testified that "any increase in value, other than site increase on the barn, is due to increased construction costs"; that "banks do not care to put a lot of lending value on outbuildings"; and that "[t]herefore, increased construction costs do not have a lot of bearing on value for outbuildings." When asked again for his expert opinion as to the specific reason for the increase in the value of Tax Lot 15, Nelsen said, "It's mostly due to market forces, site value in particular . . . ."

#### (b) District Court's Ruling

The district court found that Tax Lot 15 was owned by Larry prior to the marriage and that Carine's name was never added to any deed to that parcel. The court noted, however, that "[t]he total mortgage paydown during the marriage was . . . $25,631.00 on Tax Lot 15 . . . ." The court also found that Tax Lot 15 increased in value during the marriage, but that according to Nelsen, whose testimony the court found to be credible, the increase in value was due to market forces. Additionally, the court accepted Nelsen's testimony that normal maintenance of the barn did not increase the value of the property. The court found that Larry met his burden to prove that the increase in value was due to market forces and not to the active efforts of either party. The court concluded, "Accordingly, the only amount that can be attributed to the marital estate with respect to [the barn, Tax Lot 15], is the paydown on the mortgage[] . . . ."

#### (c) Did District Court Abuse Its Discretion?

##### (i) Premarital Land

Larry owned the 33.7 acres comprising Tax Lot 15 outright prior to the parties' marriage; it was therefore Larry's

nonmarital asset. However, the land value appreciated $411,500 during the marriage. The appreciation of nonmarital assets during the marriage is presumed marital, and the burden was on Larry to prove otherwise; we agree with the district court that he did so as to the land and its appreciation. See *Parde v. Parde*, 313 Neb. 779, 986 N.W.2d 504 (2023). Nelsen's appraisal showed that the land itself (Larry's nonmarital asset) increased in value by $411,500 during the parties' marriage. Further, Nelsen testified that the increase in land value was due to market forces. By its nature, real estate is more prone to passive appreciation. *Id.* This is because real estate tends to rise and fall in value for reasons beyond the parties' control. *Id.* Accordingly, the land, at its appreciated value, is solely Larry's nonmarital asset, and the district court did not abuse its discretion in this regard.

### *(ii) Barn*

The district court found the barn and its entire appreciation to be nonmarital. We conclude that the record demonstrates otherwise.

Larry and Carine jointly obtained a construction loan and built a barn on Tax Lot 15 just prior to their marriage. The parties made loan payments to the bank and then to Larry's mother during the marriage, before the loan was ultimately satisfied in 2005. Although built on premarital land, the barn was clearly a marital asset. Any given property can constitute a mixture of marital and nonmarital interests; a portion of an asset can be marital property while another portion can be separate property. *Parde v. Parde, supra*. The barn's conception, construction, and financing was a joint effort, with the first payment on the barn loan commencing the month the parties were married.

According to Nelsen's appraisal, the value of the barn and open shed was $254,000 in November 2022 ($794,000 total value of Tax Lot 15 minus $540,000 land value). We note that this is actually lower than the May 2002 value of

$258,200 ($386,700 total value of Tax Lot 15 minus $128,500 land value) and that thus, the barn did not appreciate during the marriage.

Using Nelsen's 2022 value of $254,000, Larry is first entitled to a setoff for his nonmarital funds used to pay down the principal on the construction loan. After Larry's mother passed away, Larry received two letters in 2005, one dated August 4, 2005, and one dated November 23, 2005, informing him that $100,000 and $53,270.89, respectively, "from the Stava Revocable Living Trust has been distributed to you in the form of a reduction of your promissory note" as of the date on each letter. Larry testified that those reductions paid off the two promissory notes, and he paid no further money on those promissory notes. Larry contends the total of those two inheritance reductions, $153,270.89, should be set off as nonmarital payments on the barn. However, we find the evidence only supports $137,701 being set off as nonmarital, as discussed next.

In January 2004, Larry's mother gifted him $10,000 and loaned him an additional $170,000; the total amount of $180,000 went to pay off two different loans at Pinnacle Bank, the construction loan ($156,754.74) and a loan for the parties' 1999 Dodge Ram and 1995 trailer ($22,024.64). At the same time, Larry and Carine signed a promissory note promising to pay his mother $157,000 (secured by Tax Lot 15) and another promissory note for $13,000 (secured by the 1999 Dodge Ram). The parties made monthly loan payments on these two notes to Larry's mother.

According to amortization calculators for each promissory note, at the time of the first distribution via Larry's inheritance reduction in August 2005, the balance on the loan secured by Tax Lot 15 was $137,701 and the balance on the loan secured by the truck was $6,719. Therefore, of the $153,270.89 inheritance distributions Larry received via reductions on promissory notes, Larry is entitled to a setoff of $137,701 of that amount from the November 2022 barn

value of $254,000. That leaves $116,299 of marital equity in the barn, rather than the $25,631 in marital mortgage principal reduction allowed by the district court. Carine is entitled to one-half ($58,149.50) of that marital equity. Carine is therefore entitled to an additional marital equalization of $45,334 ($58,149.50 minus the $12,815.50 credit already given by the district court). Adding $45,334 to the $45,000 equalization judgment previously ordered results in a modification of the equalization judgment to $90,334 owed by Larry to Carine.

## VI. CONCLUSION

Because we conclude the district court abused its discretion in how it characterized the parties' barn and its appreciation, we modify the equalization judgment from $45,000 to $90,334 owed by Larry to Carine. We otherwise affirm the district court's February 27, 2023, decree.

AFFIRMED AS MODIFIED.